UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

GLENN ARTERBRIDGE,      No. 1:21-cv-13306

    Plaintiff,

  v.          **OPINION**

WAYFAIR, LLC,

    Defendant.

**APPEARANCES**:

Manali Shah Arora
Justin L. Swidler
SWARTZ SWIDLER LLC
1101 Kings Highway North
Suite 402
Cherry Hill, NJ 08034

    *On behalf of Plaintiff*.

Robert T. Szyba
SEYFARTH SHAW LLP
620 Eighth Avenue
32nd Floor
New York, NY 10018

    *On behalf of Defendant*.

**O'HEARN, District Judge.**

## INTRODUCTION

    This matter comes before the Court on Defendant Wayfair, LLC's ("Defendant") Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6). (ECF No. 4). The Court heard oral argument pursuant to Local Rule 78.1 on February 22, 2022. For the reasons that follow, Defendant's Motion is **GRANTED**.

I.  **BACKGROUND**

Plaintiff Glenn Arterbridge ("Plaintiff") began working as a Desktop Support Engineer at one of Defendant's New Jersey warehouse locations in February 2019. (Compl., ECF No. 1-1, ¶¶ 4, 6). A little more than a year later, at the onset of the COVID-19 global pandemic, New Jersey Governor Phil Murphy declared a Public Health Emergency and a State of Emergency on March 3, 2020, leading to long-term closures of public schools and many businesses throughout the state. (ECF No. 1-1, ¶¶ 7–10). Despite these closures, Plaintiff, as an "essential worker," continued to go into work at Defendant's warehouse, which required him to work indoors and often in close proximity to others. (ECF No. 1-1, ¶¶ 21–22, 25).

In the months that followed, as the virus continued to spread, both the Centers for Disease Control ("CDC") and Governor Murphy provided guidance to citizens and businesses to try curb further infections. (ECF No. 1-1, ¶¶ 12–20). Their recommendations included, among other things, the use of diagnostic testing to determine whether workers experiencing COVID-19 symptoms were infected and the use of "[s]creening" tests to identify workers who were infected but who had not yet experienced symptoms. (ECF No. 1-1, ¶¶ 14–16). Specifically, the CDC suggested businesses "[i]mplement screening testing of select groups at least weekly plus facilitate diagnostic testing of symptomatic persons and close contacts where the community is showing substantial or high rates of transmission." (ECF No. 1-1, ¶¶ 14–16 (quotations omitted)).[1] The rationale for these recommendations was the CDC's finding that "[p]ersons with asymptomatic or presymptomatic [COVID-19] infection are significant contributors to [COVID-19] transmission." (ECF No. 1-1, ¶ 15). In multiple public press briefings, Governor Murphy echoed the CDC, encouraging New

---

[1] In July 2020, the State of New Jersey was such a community recording high rates of transmission. (ECF No. 1-1, ¶ 17).

Jersey residents—including the asymptomatic—to get tested frequently to slow the disease's spread. (ECF No. 1-1, ¶¶ 19–20).

Defendant did not implement a screening testing protocol as outlined in the CDC guidelines, but did institute a policy requiring workers who took COVID-19 tests of their own volition to refrain from coming to work while awaiting their test results, "regardless of whether they were exhibiting COVID-19 symptoms." (ECF No. 1-1, ¶¶ 27–29). Plaintiff avers that this policy did not allow for such individuals to receive paid leave during these absences. (ECF No. 1-1, ¶ 28). [2]

Plaintiff, consistent with public health guidance from the CDC and Governor Murphy, underwent a COVID-19 test on July 12, 2020, despite not having experienced symptoms of the disease or having knowingly come into contact with anyone else who had been infected. (ECF No. 1-1, ¶¶ 23–25). Because Plaintiff was not experiencing COVID-19 symptoms, he decided to continue reporting to work pending his results. (ECF No. 1-1, ¶¶ 24–25). Plaintiff thereafter learned that he had tested positive for the virus and advised Defendant of that fact.[3]

On July 27, 2020, Defendant terminated Plaintiff on the basis of his violation of the policy

---

[2] There is a significant debate between the parties as to the specific content of Defendant's policy with respect to whether paid leave was available for asymptomatic employees who remained at home while awaiting COVID-19 test results. As the present Motion seeks dismissal under Federal Rule of Civil Procedure 12(b)(6), the Court takes all plausible factual allegations in the Plaintiff's Complaint as true and views them in the light most favorable to him. *See, e.g., Evancho v. Fisher*, 423 F.3d 347, 351 (3d Cir. 2005). Thus, the Court assumes as alleged by Plaintiff that asymptomatic employees who underwent COVID-19 testing would not be paid for any missed time at work. While Defendant has submitted two Exhibits, (ECF No. 4-3), alongside its Motion to suggest otherwise and invites the Court to look outside the four corners of the Complaint to consider them, the Court declines to do so as it is unnecessary to decide this Motion.

[3] Although not specifically alleged in the Complaint, Defendant refers to Plaintiff's positive test result in its Brief in support of this Motion, (Def.'s Br., ECF No. 4 at 3–4), and the issue was discussed at oral argument. (*E.g.*, Hr'g Tr. 36:21–24). Plaintiff's counsel also implicitly acknowledged that Plaintiff had tested positive during argument. (Hr'g Tr. 33:6–21). Accordingly, this fact appears undisputed.

requiring employees awaiting test results to remain at home. (ECF No. 1-1, ¶ 27). This suit followed. (ECF 1-1).

## II. PROCEDURAL HISTORY

On May 5, 2021, Plaintiff filed this action in the Superior Court of New Jersey, Camden County, alleging that Defendant had wrongfully terminated him in violation of the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J. STAT. ANN. § 34:19-1 *et seq.* ("Count I") and New Jersey common law ("Count II"). (Complaint, ECF No. 1-1). Defendant promptly removed the case to this Court on July 2, 2021, based on diversity jurisdiction under 28 U.S.C. §§ 1332 and 1441. (Notice of Removal, ECF No. 1). After applying for and receiving a Clerk's Order to Extend Time to Answer (ECF No. 3), Defendant responded to Plaintiff's Complaint with the present Motion seeking dismissal under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on July 23, 2021. (ECF No. 4). Plaintiff filed a Response on August 24, 2021, (ECF No. 6), to which Defendant replied, (ECF No. 7).

## III. LEGAL STANDARD

To state a claim, a plaintiff's complaint needs only to provide a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although "short and plain," this statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotations, alterations, and citation omitted). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." *Id.* (citations omitted). Rather, a complaint must contain sufficient factual allegations "to state a claim to relief that is plausible on its face." *Id.* at 570.

When considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), a

court must accept the complaint's well-pleaded allegations as true and view them in the light most favorable to the plaintiff. *Evancho v. Fisher*, 423 F.3d 347, 351 (3d Cir. 2005). Through this lens, the court then conducts a three-step analysis. *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Next, the court should identify and disregard those allegations that, because they are no more than "the-defendant-unlawfully-harmed-me accusation[s]," are not entitled to the assumption of truth. *Iqbal*, 556 U.S. at 678; *Malleus*, 641 F.3d at 563. Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678).

On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). The court may only consider the facts alleged in the pleadings, any attached exhibits, and any matters of judicial notice. *S. Cross Overseas Agencies, Inc. v. Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999). The court may also consider, however, "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). If any other matters outside the pleadings are presented to the court, and the court does not exclude those matters, a Rule 12(b)(6) motion will be treated as a summary judgment motion pursuant to Rule 56. Fed. R. Civ. P. 12(b).

## IV. DISCUSSION

Plaintiff's Complaint raises wrongful termination claims under (a) CEPA ("Count I") and (b) New Jersey common law ("Count II").[4] (ECF No. 1-1). For the reasons that follow, the Court concludes that the Complaint fails to state a claim under either framework.

### A. CEPA ("Count I")

The Court first addresses Plaintiff's CEPA claim. Under CEPA, an employer may not take retaliatory action against an employee who "objects to, or refuses to participate in any activity, policy or practice, which the employee reasonably believes . . . is incompatible with a clear mandate of public policy concerning public health, safety or welfare." N.J. STAT. ANN. § 34:19-3(c)(3). To state a claim under CEPA, a plaintiff must show that

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity . . . ; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

*Dzwonar v. McDevitt*, 828 A.2d 893, 900 (N.J. 2003).

With respect to the first element, a plaintiff need not allege that his or her employer *actually* violated a law or public policy, but that the plaintiff "'reasonably believes' that to be the case." *Id.* (quoting *Estate of Roach v. TRW, Inc.*, 754 A.2d 544, 552 (N.J. 2000)). "Nevertheless—and this is an issue of law for the court—there must be an identifiable 'law, or a rule or regulation promulgated pursuant to law,' or else 'a clear mandate of public policy concerning the public

---

[4] The Court notes that Plaintiff pleads his claims alternatively, (ECF No. 1-1 at 6), as he must, because CEPA contains a waiver provision that requires plaintiffs to select a remedy for their alleged wrongful termination from among options that include CEPA and the common law. N.J. STAT. ANN. § 34:19-8. In other words, a plaintiff can succeed on a CEPA claim or a common law claim, but not both. *Id.* A plaintiff need not make this remedy selection until after discovery, however. *See, e.g.*, *Broad v. Home Depot U.S.A., Inc.*, 16 F. Supp. 3d 413, 417–18 (D.N.J. 2014).

health, safety or welfare.'" *Southward v. Elizabeth Bd. of Educ.*, No. 15-03699, 2017 WL 111924, at *5 (D.N.J. Jan. 11, 2017) (citations omitted). "A clear mandate of public policy suggests an analog to a constitutional provision, statute, and rule or regulation *promulgated pursuant to law* such that . . . there should be a high degree of public certitude in respect of acceptable versus unacceptable conduct." *Maw v. Advanced Clinical Comms., Inc.*, 846 A.2d 604, 607 (N.J. 2004) (emphasis in original; quotations omitted). Indeed, the court must be able to "identify a statute, regulation, rule, or public policy that closely relates to the complained-of conduct. The trial court can and should enter judgment for a defendant when no such law or policy is forthcoming." *Dzwonar*, 828 A.2d at 900.

Such is the case here. Plaintiff's counsel acknowledged during argument that there is no statute, regulation or rule that closely relates to the complained-of conduct and thus, his claim turns on whether Defendant violated a clear mandate of public policy. (Hr'g Tr. 21:20–25). Plaintiff alleges that Defendant terminated him because he violated a company policy when he returned to work while still awaiting results from a COVID-19 test. (ECF No. 1-1, ¶ 27). Plaintiff argues that this policy, coupled with his understanding that Defendant would not offer paid leave to employees waiting for test results—which the Court assumes as true for purposes of this Motion, *see supra* note 2—violated a clear public policy mandate articulated through guidance issued by the CDC and through public statements by Governor Murphy. The Court is not persuaded.

To begin, it is not entirely clear to the Court what mandate of public policy Plaintiff alleges Defendant violated. To be sure, the CDC and Governor Murphy communicated to business leaders and the public at large the wisdom of frequent testing for the COVID-19 virus, asymptomatic or otherwise—a message that the Court in no way means to undermine. But nothing in the guidance documents cited by Plaintiff requires businesses to adopt any particular testing protocol or to pay

7

employees who are required to stay at home pending test results. Further none of the relevant federal or state legislation passed during the pandemic required any such actions by an employer. *See, e.g.*, Families First Coronavirus Response Act, Pub. L. 116-127, 134 Stat. 178, 178–220 (2020); Act of March 25, 2020, 2020 N.J. Sess. Law Serv. ch. 17 (West). Instead, the CDC provided employers with "strategies to consider for incorporating testing . . . into workplace preparedness, response, and control plans in non-healthcare workplaces." (CTRS. FOR DISEASE CONTROL, TESTING IN NON-HEALTHCARE WORKPLACES (2021), https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/testing-non-healthcare-workplaces.html).[5] In other words, businesses were and are empowered to make their own choices with respect to testing and other COVID-19 mitigation measures, and the CDC provided guidance for those considering the implementation of testing protocols. Nothing in the document mandates that employers require or encourage asymptomatic workers to get tested, and it certainly does not speak at all to a need for an employer to provide paid leave to do so.

As for Governor Murphy's public statements, the Court notes that it is somewhat dubious of considering public statements by elected officials as proper sources for a clear mandate of public policy under New Jersey law. Plaintiff fails to provide the Court with any precedent to support his argument that statements by a public official, such as a governor, can constitute a source of a clear mandate of public policy sufficient to state a CEPA claim. But even accepting without deciding

---

[5] The Court cites here the CDC guidance document on which Plaintiff explicitly relies in his Complaint. (ECF No. 1-1, ¶¶ 14–15). Although this document obviously falls outside the four corners of the Complaint, Plaintiff's explicit reliance on it allows the Court to consider it here without converting the present Motion into one for summary judgment. *See, e.g.*, *In re Rockefeller Ctr. Props., Inc. Secs. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Moreover, as a public document generally known within this jurisdiction and not subject to reasonable dispute with respect to its or its source's accuracy, the Court may take judicial notice of the document in its entirety. Fed. R. Evid. 201; *In re Synchross Secs. Litig.*, 705 F. Supp. 2d 367, 389–91 (D.N.J. 2010).

that they are valid sources, it nevertheless remains unclear to the Court what about Defendant's actions amounted to a violation of Governor Murphy's encouragement to get tested. Defendant did not bar its employees from getting tested. Rather, Defendant simply instructed all of its employees not to report to work while awaiting test results—a period when the employees' infection statuses remained uncertain. This approach actually seems to the Court to promote public health and not to contravene public health policy. Indeed, Plaintiff's purported whistle-blowing activity—returning to work without knowing whether or not he was infected—appears more incompatible with public health policy than Defendant's policy or actions.

The Court recognizes, of course, that if Plaintiff's understanding of Defendant's policy is correct—which it assumes, given that this is a Rule 12(b)(6) motion—Defendant's employees, and especially those who were asymptomatic, may have been disincentivized from taking tests that would keep them out of work for several days without paid leave while awaiting results. But even this perspective does not seem to contravene any public policy mandate. Instead, it might encourage asymptomatic workers to take so-called "rapid" tests, results from which arrive in minutes rather than days. Most importantly and dispositive in this case is that there is simply nothing in any law, rule, regulation or mandate of public policy that prohibited an employer from adopting such a policy.

Even if there was a clear mandate of public policy violated by Defendant's policy or actions, Plaintiff's claims still fails as he cannot meet the second element of a CEPA claim because he cannot show that he engaged in any whistleblowing activity. Plaintiff argues he engaged in whistleblowing by taking a COVID-19 test. The Court easily rejects any such allegation. There is nothing to support a finding that an employee taking a COVID-19 test is whistleblowing activity. Further, the Court also notes that it is not abundantly clear from the Complaint whether Plaintiff

believed that his return to work complied with Defendant's policies because he was asymptomatic, (ECF No. 1-1, ¶¶ 24–25), or that he knew he was returning in violation of the policy and that doing so constituted whistleblowing activity, (ECF No. 1-1, ¶ 32). During oral argument, Plaintiff's counsel alleged that Plaintiff *did not* know that returning to work while awaiting test results violated Defendant's policy. (Hr'g Tr. 12:1–2). While the allegations in the Complaint seem to suggest otherwise, accepting Plaintiff's counsel's claim during argument that Plaintiff did not know that his return to work with pending test results violated Defendant's policy negates his CEPA claim entirely as Plaintiff could hardly have refused to participate in a policy or practice that he did not know he was disobeying.

In any event, because the Court is unable to identify "a statute, regulation, rule, or public policy that closely relates to the complained-of conduct[, it] can and should enter judgment for [the] defendant." *Dzwonar*, 828 A.2d at 900. It does so here with respect to Count I.

### B. New Jersey Common Law ("Count II")

The Court turns next to Count II, Plaintiff's common law wrongful termination claim. In New Jersey, as elsewhere, at-will employees generally may be terminated by their employers at any time without cause. *Pierce v. Ortho Pharm. Corp.*, 417 A.2d 505, 508–09 (N.J. 1980). However, New Jersey law recognizes an exception to this general rule, forbidding employers from terminating employees for reasons that contravene "a clear mandate of public policy." *Id.* at 512.

"[T]he existence of a clear mandate of public policy is an issue of law." *Mehlman v. Mobil Oil Corp.*, 707 A.2d 1000, 1012 (N.J. 1998). Courts weighing *Pierce* claims must consider the interests of the employee, the employer, and the public at large. *MacDougall v. Weichert*, 677 A.2d 162, 167 (N.J. 1996). Plaintiffs raising a wrongful termination claim under *Pierce* bear a "heavy burden" in proving that their terminations violated such a clear mandate, *Pietrylo v. Hillstone Rest.*

10

*Grp.*, No. 06-05754, 2008 WL 6085437, at *5 (D.N.J. July 24, 2008), because employers are generally entitled to "run their businesses as they see fit as long as their conduct is consistent with public policy." *Pierce*, 417 A.2d at 511.

The *Pierce* court provided a non-exhaustive list of sources for public policy mandates, including "legislation; administrative rules, regulations or decisions; and judicial decisions." *Id.* at 512. Regardless of its source, the mandate must "be clearly identified and firmly grounded[;] A vague, controversial, unsettled, and otherwise problematic public policy does not constitute a clear mandate." *MacDougall*, 677 A.2d at 167. Most often, these cases arise when an employer terminates an employee for that "employee's resistance to or disclosure of an employer's illicit conduct." *Id.* at 168.

This is not such a case. For the same reasons that Plaintiff's CEPA claim fails as detailed above, so too must his claim under New Jersey common law. It remains unclear to the Court what public policy—let alone one which is clearly mandated—Defendant violated here. Moreover, this conclusion is consistent with those made by other federal courts presented with similar issues in the context of this pandemic. *See, e.g.*, *Warner v. United Nat. Foods, Inc.*, 513 F. Supp. 3d 477 (M.D. Pa. 2021) (granting a motion to dismiss under similar Pennsylvania law because plaintiff could not identify a clear mandate of public policy articulated by governor's executive orders regarding COVID-19 testing); *Valdivia v. Paducah Ctr. for Health & Rehab., LLC*, 507 F. Supp. 3d 805 (W.D. Ky. 2020) (granting a motion to dismiss under similar Kentucky law because plaintiff could not identify a clear mandate of public policy articulated by state administrative regulations or governor's executive orders regarding COVID-19 testing). Further, it would be illogical to find that the Defendant's actions here violated public policy when these other federal courts have rejected such claims where an employer terminated a *symptomatic* employee for

11

missing work due to pending test results and medical instructions to quarantine. *See Warner*, 507 F. Supp. 3d 484–85 (finding sympathy for, but rejecting, plaintiff's argument that his termination for being absent when medically instructed to quarantine violated public policy); *Valdivia*, 507 F. Supp. 3d at 811–13 (rejecting wrongful-termination-in-violation-of-public-policy claim where employee was terminated for missing work due to her desire to be tested for COVID-19); *Hermes v. Okla. Arthritis Ctr.*, No. 20-00871, 2021 WL 3540322, at *5–6 (W.D. Okla. June 8, 2021) (rejecting wrongful-termination-in-violation-of-public-policy claim under Oklahoma law and holding that executive orders related to COVID-19 testing did not constitute a clear mandate of public policy).

In sum, the Court concludes that Plaintiff has failed to plead a sufficiently clear mandate of public policy and consequently fails to plead Defendant's violation of such a mandate. Accordingly, he has failed to state a wrongful termination claim under New Jersey common law, and thus Count II must also be dismissed.

*****

As a conclusory note, the Court emphasizes that the none of the foregoing should be taken as an endorsement of the wisdom, clarity, or propriety of Defendant's policies with respect to COVID-19 mitigation, nor as a suggestion to businesses or residents of New Jersey to disregard the recommendations of the CDC or elected officials to stop the spread of the virus. This, obviously, is not the Court's role. Instead, this Opinion merely performs an analysis of the law and applies it to Plaintiff's well-pleaded allegations and concludes that under New Jersey law Plaintiff has failed to state a CEPA or common law claim.

## **CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Defendant's Motion to Dismiss. (ECF No. 4). An appropriate Order accompanies this Opinion.

      */s/ Christine P. O'Hearn*
      **CHRISTINE P. O'HEARN**
      **United States District Judge**